## MACKENZIE v. SEEBERGER.

(Circuit Court of Appeals, Eighth Circuit. August 24, 1896.)

No. 731.

1. VENDOR AND PURCHASER—FIDUCIARY RELATIONS.
   If one who has made a contract to purchase land proposes to sell a portion thereof to a third party, who accepts the offer, the transaction cre-

ates the relation of vendor and vendee, and establishes no fiduciary relation.

**2. SAME—CONSTRUCTION OF CONTRACT.**

Plaintiff, who, with another, had a contract to purchase land, wrote defendant that, "in view of our determination to let you come in on the ground floor," he would sell to defendant a one-half interest in the property for a sum named, "or exactly what it cost," and then named the terms of the sale, which were different from those on which he bought. Subsequently a sale to defendant was consummated on still different terms. *Held* that, the testimony of the persons who used the term "come in on the ground floor" in this transaction, as to its significance, being contradictory, that question was properly left to the jury.

**3. PURCHASE OF LAND—RIGHTS OF JOINT VENDEES.**

Plaintiff's contract of purchase provided that a farm held by another person in trust for plaintiff's wife should be accepted by the seller in payment at a certain figure. *Held*, that one who afterwards joined him as a co-purchaser, coming in "on the ground floor," could not complain that the figure named for the farm exceeded its value, since plaintiff, in disposing of the farm, merely acted as agent for his wife's trustee, to whom he would have to account for its proceeds at the figure named.

**4. VENDOR AND PURCHASER—MISREPRESENTATIONS.**

A mere statement made by the vendor as to what the property cost him, or what he was to pay for it to the person from whom he bought it, is ordinarily not material as affecting the transaction, and the doctrine of caveat emptor applies.

**5. TRIAL—INSTRUCTIONS—COMMENTS ON DEFENDANT'S CLAIM.**

Defendant's counsel claimed on the trial that defendant was entitled to a counterclaim of $3,500, but on appeal there was no claim that the testimony showed a right to more than $3,005. *Held*, that it was proper to charge the jury, in reference to the former claim, that "exactly how the defendant's counsel work out that proposition is not clear to the court. You must always, gentlemen of the jury, make a distinction in your verdict, whether lawyers do or not, between theory and fact. Theory is one thing, and facts are another."

In Error to the Circuit Court of the United States for the Western District of Missouri.

O. H. Dean (L. C. Krauthoff was with him on the brief), for plaintiff in error.

Frank H. Scott (J. McD. Trimble, Charles A. Braley, John H. Hamline, and Frank C. Lord were with him on the brief), for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge. This writ of error was sued out to reverse a verdict and judgment against James Mackenzie, the plaintiff in error, upon his promissory note. Charles D. Seeberger, the defendant in error, filed in the court below the usual petition for a recovery of the amount due upon this note. Mackenzie answered that the note was without consideration, and was obtained by the deceit and fraud of the defendant in error; that he had already been induced by the same fraud to pay him $3,250 that he did not owe him; and he prayed for a judgment against Seeberger for this amount. He alleged that in October, 1887, the defendant in error was negotiating with one Charles H. Smyth and one R. Preston Chew for the purchase of section 10 and the N. W. ¼ of section 14 in township 38, range 28, being 784 acres of land, for $129,300, and a farm in Ohio that was not

worth more than $3,000, and that he subsequently consummated the trade on that basis; that while he was negotiating for this purchase, and before he had made it, he represented to the plaintiff in error that he was bargaining for the purchase of section 10 for $129,300, and that the incidental expenses of the purchase were $700, so that section 10 would cost $130,000, and then solicited the plaintiff in error to "come in on the ground floor," and contribute one-half of this purchase money, and take one-half of the section; that thereupon, in reliance upon these representations, he associated one Hawkins with himself, and they contributed one-half of the $130,000, $30,000 in cash and $35,000 in their notes, and received conveyances of the E. ½ of section 10 therefor; that the N. W. ¼ of section 14 was as valuable as section 10, and Seeberger, by the trade which he made, in fact paid only $108,000 for section 10, but the plaintiff in error did not learn that the quarter section in 14 and the Ohio farm were in the trade until after he had paid all his notes, except that in suit, which was for $2,250, and was one of the notes which he gave as a contribution towards the purchase price of the property. It was upon this statement of facts that he claimed that he had already paid to the defendant in error $3,250 more than his one-fourth of the purchase price of section 10, and that the note in suit was without consideration. The defendant in error replied to this answer that the note in suit was given for a part of the purchase price of section 10; that the Ohio farm belonged to his wife, and that he did negotiate an exchange of that farm for the quarter section of 14 in his trade for section 10, but that the quarter section was conveyed to a trustee for his wife in exchange for her farm, and that he had no interest in it except such as he might have by virtue of his marital rights; that section 10 did cost him $130,000; and that one-half of this, or $65,000, was the amount for which he sold the E. ½ of that section to Mackenzie and Hawkins. He denied all the other allegations of the answer.

At the trial, there was testimony that the plaintiff in error did, and that he did not, know the terms of the trade between Seeberger and Smyth and Chew before he bought the E. ½ of section 10. There was conflicting testimony as to the value of the Ohio farm. The lowest estimate of its value was $4,000, while the consideration recited in the deed of it to Smyth and Chew was $12,000. The following facts were established: In the early part of August, 1887, the defendant in error had obtained from Smyth and Chew the option to buy section 10 and the N. W. ¼ of section 14 from them, for $129,300 and the Ohio farm. On August 27, 1887, he accepted the option, and made written contracts to purchase the property on that basis. Before these contracts were made, he had offered to sell to the plaintiff in error an undivided half of section 10, for $100,000. On September 15, 1887, the plaintiff in error and one Nesbitt accepted this offer, and made a written contract with the defendant in error to purchase the undivided half of section 10 for $100,000. Nesbitt failed to get the money to perform his part of the contract, and it was abandoned. On October 8, 1887, Isaac E. Adams, who was the authorized agent of the defendant in error to do so, wrote in this way to the plaintiff in error:

"As I told you this morning, Mr. Seeberger could now carry through the purchase on the original terms, but, in view of our after determination to let you 'come in on the ground floor,' he makes the following new proposition: To sell you an undivided one-half interest in section 10 for $65,000, or exactly what it costs him. He is to take care of the remaining property. Selling at these rates, he would desire $25,000 cash. He would take $22,500 in shape of a mortgage secured by the half section, payable on or before one, two, or three years, with interest at 6 per cent. per annum, with clauses providing for a release upon part payment, etc. The remaining $17,500 of the purchase price he would arrange in any way which might be satisfactory to you, or he would like to let it remain in the property as his undivided pro rata interest in said half section."

Mackenzie did not accept this proposition, but on October 11, 1887, wrote Seeberger that he had a friend who would join him in the purchase of the half section, provided he would separate it from the other half, and sell it to him on the terms stated in Adams' letter. Negotiations continued between them until some time in November, 1887, when Seeberger sold and caused to be conveyed to Mackenzie and his friend Hawkins the E. ½ of section 10, for $65,000. Each of these purchasers paid him $15,000 in cash, and each of them gave his individual notes for $17,500, for his share of the purchase. The terms of payment for the purchase made by Mackenzie and his friend differed materially from the terms of payment of the $129,300 required of Seeberger in his contracts of purchase from Smyth and Chew.

Upon this state of facts, the court below charged the jury that the effect of the plea in Mackenzie's answer was, not that Seeberger had made a contract with Smyth and Chew for the purchase of the land, but that he was merely negotiating therefor, when, in October, 1887, he solicited the plaintiff in error to join with him in making the purchase, to take one-half of section 10, and to contribute his ratable proportion of the purchase price. It charged them that the gist of Mackenzie's grievance was that Seeberger had conducted the negotiations with Smyth and Chew on their joint account, and had, by deceit, induced him to contribute more than his proportionate share of the purchase money paid for the lands bought of them. The court continued in this way:

"The theory of this issue is that, if the plaintiff thus undertook to make this purchase on the joint account of himself and the defendant, it established a fiduciary or trust relation between the parties, and the law would expect of Seeberger good faith and common morality in disclosing to the defendant, his co-purchaser and confiding associate, the true amount of the purchase money agreed to be paid, and to give him an equal share in all the property so purchased. Whereas, if the transaction was that Seeberger had already in October, 1887, contracted with Chew and Smyth in his own right and for his and others' benefit other than the defendant, and so, having such contract, he proposed to sell one-half of section 10 to the defendant, and the defendant accepted such offer, that established a relation simply of vendor and vendee between them, and not a fiduciary relation like that in the case presented in the defendant's answer."

An exception was taken to the last paragraph of this quotation. The criticism of it is that it proceeds upon the erroneous theory that the fiduciary relation between Seeberger and Mackenzie must have existed at or before the time when Seeberger made his contracts with Smyth and Chew. Perhaps it would be a conclusive answer to this objection to say that the court was treating an issue tendered by the

answer of the plaintiff in error, which alleged, as the court charged
(and that without objection or exception on his part), that the fiduci-
ary relation arose in this case, not after Seeberger had made his con-
tracts for the purchase of the land, but while he was merely nego-
tiating therefor.    There could be no error in clearly presenting the
issue which the plaintiff in error had tendered by his answer.    A
more satisfactory answer to this objection, however, is that, if we
throw the pleading out of view, there is really nothing in the para-
graph criticised, to the effect that the fiduciary relation between
these parties might not be established as well after the contracts of
purchase were made by Seeberger as before.    The conclusion of a
contract of purchase, and the subsequent sale by the purchaser of a
portion of the property he has bought to another, creates no fiduciary
relation between the parties to the second sale.    Every vendor who
sells land he has lately purchased does not thereby make himself the
agent or the partner of his vendee to complete his own purchase.
Something more is necessary to establish this trust relation.    The
charge of the court here was no more than the statement of this
axiomatic proposition.    It was that if one who has made a contract
of purchase of land proposes to sell a portion of it to a third party,
and the latter accepts the offer, that transaction creates the relation
of vendor and vendee between them, and establishes no such fiduci-
ary relation as that pleaded in the answer.    That position is im-
pregnable.    It needs no defense.    Moreover, it is clear that the jury
must have perceived that this was the only effect of this paragraph,
and that the case was not submitted to them on the erroneous theory
that the fiduciary relation could not have been established after See-
berger had made his contracts of purchase, when this sentence is
read in its connection, and the whole charge is considered.    See-
berger's contracts of purchase were made August 27, 1887.    The let-
ter which contained the proposition to let Mackenzie in "on the
ground floor," and to sell him one-half of section 10 for "$65,000, or
exactly what it costs Seeberger," was written October 8, 1887, and
all the negotiations for the sale on this basis were on and subsequent
to that date.    If the court had been of the opinion that this trust rela-
tion could not be established after Seeberger had contracted to pur-
chase the land, it would have been compelled to peremptorily instruct
the jury to return a verdict for the defendant in error.    It did not do
so, but followed the sentence we are considering with a careful analy-
sis of the proposition contained in the letter of October 8th, and an
extended review of the evidence relating to the negotiations and the
sale which followed it, and then instructed the jury that the first and
principal question for them to decide was whether this transaction es-
tablished the trust relation of principal and agent, or of co-purchasers,
between Mackenzie and Seeberger, or the relation of vendor and
vendee.    The considerations to which we have briefly adverted com-
pel the conclusion that there was no error in the paragraph of the
charge under consideration.

The court closed the portion of its charge relating to the issue of the
fiduciary relationship of these parties with these words:    "The ques-
tion of fact for you to determine is whether or not the relation of ven-

dor and vendee in fact did exist between the plaintiff and defendant in respect of this section of land in controversy." This statement is assigned as error on the ground that there was no such issue presented in the pleadings. The answer pleaded the fiduciary relationship of co-purchasers between Seeberger and Mackenzie. The reply denied every allegation of the answer which it did not admit. It did not admit the trust relation, but averred that the note in suit was given for part of the purchase price of half of section 10, which Seeberger had sold to Mackenzie. In view of the fact, which the evidence discloses, that this was the principal question tried in the court below, we are forced to the conclusion that these allegations and denials sufficiently present this issue.

After stating to the jury that the terms of payment of the proposition contained in the letter of October 8, 1887, differed materially from those contained in the contracts between Smyth and Chew and Seeberger, and after reading the proposition and pointing out these differences specifically, the court said:

"[Taking the letter in its entirety, is it not such as indicates a sale between Seeberger and the plaintiff for this property at a stipulated price?] * * * The contention of the defendant is that the meaning of the term 'come in on the ground floor' is that he was to have whatever benefits accrued to Seeberger by reason of his contracts with Chew and Smyth. [Now, gentlemen of the jury, of course you are to determine for yourselves what meaning and what importance is to be attached to this expression 'come in on the ground floor,' as employed between the parties. There is no evidence before you, gentlemen of the jury, to the effect that that term, as employed by Adams in Chicago, had acquired any specific or special peculiar meaning or significance in any particular trade or business.] The question was asked Mr. Adams as to what he understood by that term, and you remember his answer about that matter. The question was asked the plaintiff, Seeberger, in this case, what he understood in regard to it, and his answer was in substance, as I have it, that 'on the ground floor' meant 'on the same terms that Adams and I had as to section 10 personally'; that is, he meant to say, as the court understands it (that is a question, however, for you), that he had an arrangement with Adams by which Adams was to share in the section 10 on terms between them, which seem afterwards to have been the subject of controversy between them as to section 10. Where a phrase is used in a contract or in a letter that has a settled ordinary meaning, the law presumes it to have been used in its ordinary acceptation as it obtains among the common people. If you seek to give to the words used a different meaning than that which their simple version and significance implies, then you are to find that it has acquired in certain trades and in certain businesses a peculiar signification or meaning that is special, and that the parties used it in that sense in the subject-matter of litigation or controversy. * * * [Counsel, gentlemen of the jury, call my attention to the fact that I omitted, in speaking about the testimony as to the meaning of the phrase 'come in on the ground floor,' to mention the fact that Mr. Mackenzie, the defendant, gave a version of that matter. Whatever it was, you will recollect and determine that for yourselves.]"

Exceptions were taken to the portions of the charge above quoted that are inclosed in brackets. The objection urged to the first sentence is that the inference of a sale at a stipulated price is not warranted by the terms of the letter of October 8, 1887, or by the circumstances surrounding it. The jury and the court below thought otherwise. In view of the facts that the terms of sale proposed in that letter differed materially from those contained in Seeberger's contracts

of purchase, that the proposition contained in the letter was not accepted, but a contract was finally made by which Mackenzie purchased a separate tract of land in section 10, instead of a joint interest in the section with Seeberger, and that the testimony of the witnesses upon this issue was in conflict, we are unwilling to say that there was no foundation in the letter and the surrounding circumstances for the conclusion which the court below and the jury reached upon this question.

For the same reasons, we have been forced to the conclusion that there was no error in submitting the meaning of the term "come in on the ground floor," in the letter of October 8th, to the jury in this case. It is said that the meaning of the term was defined in the letter itself to be to come in at "exactly what it costs him [Seeberger]." But the crucial question here was not at what price, but how Mackenzie was to come in at that price, whether as a co-purchaser with Seeberger, or a purchaser from him. That was the question which the jury was to decide from the significance of this expression and all the other facts and circumstances before them. It may be that it would have been the duty of the court to declare the meaning of this term in the letter, if that letter had become the sole embodiment of the terms of the contract. The court was not, however, requested to do so. The proposition contained in the letter was not accepted without modification. The proposition itself was inconsistent with the ordinary significance of the term "come in on the ground floor," which is to come in on the same terms as the proposer is or is to be in. The terms of the consummated sale to Mackenzie and Hawkins were still more inconsistent with the ordinary meaning of this term, and there was conflicting testimony of witnesses who used the term in this transaction as to its significance. Under these circumstances, the question as to its signification in this transaction was not improperly submitted to the jury, together with the surrounding facts and circumstances proved.

There was no just ground of objection to the last paragraph of the charge quoted above. The court called the attention of the jury to the testimony of Mackenzie in substantially the same way that it spoke of the testimony of Adams upon the same subject. It was under no obligation to review the testimony of either of them in detail.

Another error assigned is that the court charged the jury as follows:

"In the negotiations for a sale or leading to a sale, between the vendor and the vendee, the mere statements made by the vendor as to what the property cost him, or what he was to pay for it to the person from whom he bought it, ordinarily are not material as affecting the transaction. It is what is known as 'puffing the value' and commendation of the property, which the law permits; and, as to such statements, ordinarily the doctrine of caveat emptor applies,—that is, that the purchaser must look out. He is foolish to credit it, and the law does not undertake to afford him redress against his own neglect and his own fault."

This, however, was a correct statement of the law. Hemmer v. Cooper, 8 Allen, 334; Cooper v. Lovering, 106 Mass. 77; Bishop v. Small, 63 Me. 12; Bourn v. Davis, 76 Me. 223; Medbury v. Watson, 6 Metc. (Mass.) 246.

It is assigned as error that the court below charged the jury that, if they found the existence of the fiduciary relation between Seeberger and Mackenzie, the latter could not "come in on the ground floor" unless he contributed his share of the established price at which Seeberger put the Ohio farm into the trade between himself and Smyth and Chew; and that, if he put that farm into that transaction at $12,000 or at any other price, he was entitled, as against Mackenzie, to the full benefit of that price, although it might have been in excess of the real value of the farm.

On October 8, 1887, when the proposition was made to Mackenzie to let him "come in on the ground floor," Seeberger had made his contracts of purchase from Smyth and Chew, and his rights and liabilities in that transaction were fixed. The utmost that Mackenzie could lawfully claim under the proposition made to him was that he should have a share of the same benefits, subject to the same burdens, that Seeberger had under these contracts. Now, the Ohio farm was his wife's property, and its title stood in one Curtis, in trust for her. He had agreed to cause that farm to be conveyed to Smyth and Chew, and to pay to them $129,300 for the N. W. ¼ of section 14 and section 10. In thus disposing of the Ohio farm, he was the agent of Curtis, the trustee of his wife; and if, in the trade with Smyth and Chew, he had agreed that the Ohio farm paid $12,000 of the consideration for the lands which he was to obtain from them, then he was bound to account to the trustee of his wife for that $12,000, and to pay it to him. Mackenzie and every other party who, after that contract was made, "came in on the ground floor" with him, was bound to contribute pro rata to the payment of the price at which he had traded the farm for this land. The charge of the court upon this question was not erroneous. The proposition to Mackenzie was not to give him any better trade or any higher rights than those which Seeberger had.

The court told the jury:

"It is assumed in the answer and in argument that that tract (quarter section of fourteen) stood to the plaintiff as a profit for seven thousand dollars, and that the defendant is entitled not only to get rid of paying the $2,250 note in controversy, but is entitled to a counterclaim against plaintiff for $3,500. [Exactly how the defendant's counsel work out that proposition is not clear to the court. You must always, gentlemen of the jury, make a distinction in your verdict, whether lawyers do or not, between theory and fact. Theory is one thing, and facts are another.] You are to judge of the facts, and draw your own conclusions from them as they appear to you from the evidence."

Counsel for the plaintiff in error excepted to that part of this instruction contained in the brackets, and thereupon the court said:

"Gentlemen of the jury, the defendant's counsel suggest that the court should have been more specific in its views about how they arrived at their contention that they were entitled to a counterclaim of $3,500. My statement was to you, and the court repeats it, that it did not understand exactly how they arrived at that result, and that is a question of fact in the case for the jury."

An exception was taken to the last sentence quoted.

The portions of the charge at which these exceptions are leveled discuss no propositions, and hence contain no errors of law. Nor

are we persuaded that they either tended to mislead the jury in the consideration of any questions of fact, or to prevent the plaintiff in error from obtaining a fair and impartial trial of his case. The fact seems to have been that, in the heat of argument, a claim had been made on his behalf for a recovery of $3,500 on his counterclaim. It is not now claimed that there was any testimony that would sustain a recovery of more than $3,005. Upon what theory a larger amount was claimed does not appear. Doubtless, there was a theory, and the court properly cautioned the jury against any theories that were not sustained by the facts, and told them that they must be governed by the latter. Regarding this claim of counsel for the plaintiff in error to recover the $3,500, the court simply remarked that it did not understand exactly how they reached that result, and properly told the jury that the amount of the recovery was a question of fact for them to determine. There was certainly no error in this. No one seems to understand yet how the right to recover $3,500 on this counterclaim could have been deduced from the facts proved.

The judgment below must be affirmed, with costs; and it is so ordered.